IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-cv-00809-FL

**Cheryl D. Watson,**

                Plaintiff,

v.

**Carolyn Colvin**, Acting Commissioner of
Social Security,

                Defendant.

**Memorandum &Recommendation**

Plaintiff Cheryl D. Watson instituted this action on November 14, 2014 to challenge the denial of her applications for disability benefits and supplemental security income. Watson claims that Administrative Law Judge ("ALJ") David Benedict erred in evaluating both the medical opinion evidence and Watson's credibility, failed to properly determine Watson's residual functional capacity ("RFC"), failed to consider the decision of another agency, and failed to consider additional evidence. Both Watson and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 17, 27.

After reviewing the parties' arguments, the court finds that ALJ Benedict erred in his determination. Substantial evidence does not support ALJ Benedict's credibility assessment or the RFC determination with respect to Watson's moderate limitations in her ability to maintain concentration, persistence, and pace. Additionally, remand will allow the Commissioner to consider both the finding of another agency and the additional records submitted on Watson's

behalf. Therefore, the undersigned magistrate judge recommends[1] that Watson's Motion for Judgment on the Pleadings be granted, that Colvin's Motion for Judgment on the Pleadings be denied, and that the Commissioner's final decision be reversed and remanded for further consideration.

## I. Background

On October 21, 2011, Watson filed applications for supplemental security income and disability benefits on the basis of a disability that allegedly began on June 21, 2009. After her claim was denied at both the initial stage and upon reconsideration, Watson appeared before ALJ Benedict for a hearing to determine whether she was entitled to benefits. After the hearing, ALJ Benedict determined that Watson was not entitled to benefits because she was not disabled. Tr. at 11–21.

ALJ Benedict found that Watson had the following severe impairments: effects of status post carpal tunnel release; effects of status post bilateral ulnar decompression at the elbows; right shoulder tendinopathy; degenerative disc disease of the cervical spine; hypertension; degenerative joint disease of the right hand; degenerative joint disease of the left thumb; obesity; and major depressive disorder. *Id.* at 14. ALJ Benedict also found that her impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* ALJ Benedict determined that Watson had the RFC to perform light work, except that she can only occasionally push and pull bilaterally with the upper extremities; can only occasionally balance; can only occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; can frequently handle and finger with her right upper extremity; must avoid all exposure to vibrations and avoid concentrated exposure to hazards including dangerous, moving machinery, and work at

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

unprotected heights; and can understand, remember, and carry out simple, routine, repetitive tasks. *Id.* at 15. ALJ Benedict also concluded that Watson was unable to perform any past relevant work but that, considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she was capable of performing. *Id.* at 19–20. These jobs included: cashier, storage facility rental clerk, and routing clerk. *Id.* at 21. Thus, ALJ Benedict found that Watson was not disabled. *Id.*

After unsuccessfully seeking review by the Appeals Council, Watson commenced this action and filed a complaint pursuant to 42 U.S.C. § 405(g) on November 14, 2014. D.E. 6.

## II.    Analysis

### A.    Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Watson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.    Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the

claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment then, at step four, the claimant's RFC is assessed to determine whether plaintiff can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.    Medical Evidence

Watson has a history of upper extremity impairments. She had surgery in October 2009 for both right carpal tunnel syndrome ("CTS") and right cubital tunnel syndrome ("CBTS"). Tr. at 368–69. Following surgery, Watson's activity with the right upper extremity was limited and she was advised to increase use as she could tolerate it. *Id.* at 367. Watson underwent occupational therapy and her orthopedist assessed a 10 pound lifting restriction at follow-up appointments in November 2009, January 2010, and February 2010. *Id.* at 361–65.

Watson had a nerve conduction study performed in March 2010. *Id.* at 357–59. It revealed median nerve sensory involvement at her wrists and severe left-sided slowing of the ulnar nerve at the elbow. *Id.* A follow-up orthopedic examination showed positive Tinel's signs

at both elbows with distal pain in her fingers. *Id.* at 355. She was diagnosed with bilateral CTS and ulnar nerve decompression surgery for the left side was recommended. *Id.*

Watson sought treatment from Cumberland County Health Department ("CCHD") on July 20, 2010, for right arm swelling and pain. *Id.* at 376–77. Examination showed extreme edema and decreased strength. *Id.* An MRI of her neck and right shoulder revealed moderate rotator cuff tendinopathy, tears in the labrum of her shoulder, mild degeneration in the discs of her spine with ligamentous hypertrophy, and mild to moderate spinal canal narrowing and neuroforaminal narrowing at multiple levels. *Id.* at 380–83.

At an October 13, 2010 appointment with her orthopedist, testing showed moderate slowing of the ulnar nerve at the elbow on the right and severe slowing of the ulnar nerve at the elbow on the left. *Id.* at 353. Watson complained of persistent arm pain and swelling. *Id.* She had positive Tinel's signs and tenderness to palpitation at the elbow. *Id.* She was diagnosed with severe CBTS at the left elbow and mild CTS on the left hand. *Id.* Watson went to UNC complaining of bilateral upper extremity pain in October 2010. D.E. 18-1 at 2–4. Examination showed swelling, tingling, mild limitation of wrist extension, mild tenderness to palpitation and intact strength. *Id.* Watson was diagnosed with bilateral upper extremity pain with possible complex regional pain syndrome ("CRPS") or chronic neuropathic pain of the bilateral upper extremities. *Id.*

Watson had left ulnar decompression surgery on October 22, 2010. Tr. at 351–52. A November 2010 follow-up appointment noted swelling and Watson was directed to protect her elbow and minimize flexation. *Id.* at 349. She was permitted to gradually increase the use of her arm as tolerated. *Id.* Later that month, Watson presented to CCHD for arm pain and examination showed swelling, tenderness, and decreased strength in her right forearm. *Id.* at 372–73.

5

In November 2011, Watson was examined by Dr. Alan Cohen. *Id.* at 384–88. Dr. Cohen found that she was able to pinch and grasp but that she protected her right upper extremity by keeping it close to her torso. *Id.* Examination also found full 5/5 strength and positive Tinel's sign in the right upper extremity. *Id.* at 385. Dr. Cohen diagnosed her with status post bilateral CBTS and status post right CTS decompression surgeries with residual right median allodynia. *Id.* at 386. Dr. Cohen opined that Watson's ability to lift, carry, and handle objects was moderately impaired. *Id.* A psychological evaluation later that month noted that Watson tried to perform household activities but that she has to take frequent breaks because of her medical conditions. *Id.* at 391. She also reported that she no longer drove. *Id.*

Watson again presented at CCHD for upper extremity pain in December 2011. *Id.* at 395–96. An examination found swelling and reduced range of motion in her right hand. *Id.* A January 2012 nerve conduction study showed evidence of bilateral median neuropathies at the wrists and a superimposed mild left ulnar sensory mononeuropathy at or distal to Guyon's canal. D.E. 18-1 at 6–8. A March 2012 follow-up at CCHD again showed decreased range of motion, swelling, and tenderness in the right forearm. Tr. at 393. Watson returned to UNC that month for complaints of numbness and swelling, for which carpal injections had been given but did not relieve her pain. D.E. 18-1 at 13–14. Physical examination showed weakness but no sensory loss. *Id.* The following month, Watson received cervical epidural steroid injections, but they failed to alleviate her pain. *Id.* at 16, 21–22. She was diagnosed with chronic post-operative neuropathic pain and symptoms of CRPS minus allodynia. *Id.* at 21–22.

In June 2012, Watson returned to CCHD for pain, and edema in her hands was observed. Tr. at 408–09. The following month, Dr. Manoj Wunnava opined again that Watson was suffering from chronic post-operative neuropathic pain with elements of CRPS. D.E. 18-1 at 24–

25. In November 2012, Dr. Wunnava noted significant swelling in her right hand and wrist and significantly reduced range of motion in the flexation and extension of the right wrist. *Id.* at 33–35. An April 2013 follow-up at CCHD for continuing wrist pain noted positive Tinel's sign in the right and positive bilateral Phalen's signs in the wrists. Tr. at 413.

### D.  Medical opinion evidence

Watson first contends that ALJ Benedict erred in assessing the opinion of Dr. Karen Jones, Watson's treating orthopedic surgeon. She notes that Dr. Jones performed three surgeries on her right and left upper extremities. ALJ Benedict discounted Dr. Jones's opinion because, he found, they were given during the postoperative period and did not have the benefit of later evaluations. Tr. at 18–19. There is substantial evidence to support ALJ Benedict's determination.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. § 404.1527(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quotations & citations omitted). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (explaining "the ALJ holds the

discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05–CV–46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96–2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96–6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love–Moore v. Colvin*, No. 7:12–CV–104–D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (unpublished) (citing *Hill v. Astrue*, 698 F.3d 1153, 1159–60 (9th Cir. 2012*); Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747, 750 (6th Cir. 2007); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006)). However, "[i]n some cases, the failure of an ALJ to explicitly state the weight given to a medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for discounting it are reasonably articulated." *Bryant v. Colvin*, No. 5:11–CV–648–D, 2013 WL 3455736, at *5 (E.D.N.C. July 9, 2013) (unpublished) (citations & quotations omitted).

Here, Watson argues that Dr. Jones's findings, while proximate in time to the post-operative period, are nonetheless relevant to show her ongoing functioning. She notes that she was out of work for several weeks and that Dr. Jones imposed a 10 pound lifting restriction. Tr. at 361–67. At the hearing, the Vocational Expert ("VE") stated that such a restriction would limit a claimant to sedentary work. *Id.* at 60–63. Watson points out that Dr. Jones's findings are within the relevant time period at issue and that she developed chronic pain and weakness following her surgeries.

The Commissioner argues that Dr. Jones's opinion and her assessed lifting restriction relate only to the period immediately following her surgeries and is not consistent with other, later evidence in the medical record. *Id.* at 18–19. Such evidence includes: a notation that Watson experienced improvement in February 2010, *id.* at 361; Dr. Jones's statement that she expected Watson's function to improve, *id.* at 355, 361; in March 2010, Watson had no weakness, *id.* at 355; in October 2010, Watson complained of pain but she had no instability or weakness, *id.* at 353; and, in November 2010, shortly after her second surgery, medical records noted that Watson could gradually increase use of her arm as tolerated, *id.* at 349. Although Dr. Jones assessed a 10 pound lifting restriction from the time of Solis's October 2009 surgery through February 2010, the restriction was not included in subsequent treatment notes. *Id.* at 349–365. Further, consultative examiner Dr. Cohen noted generally normal findings and found that Watson could reach overhead, pinch, grasp, and manipulate objects with her hands. *Id.* at 385–86. Records from Cumberland County Health Department from December 2011 through April 2013 noted that Watson complained of hand pain but that she had no weakness. *Id.* at 393–96, 408–14.

In sum, the more recent evidence in the record discloses improvement in Watson's condition post-surgeries as evidenced by subsequent evaluations. In light of these later records which undermine Dr. Jones's assessments in the months following Watson's surgeries, ALJ Benedict did not err in giving Dr. Jones's opinion, and her 10 pound lifting restriction, little weight. Accordingly, the Commissioner is entitled to judgment in her favor on this issue.

### E. Credibility

Watson next asserts that ALJ Benedict erred in assessing her credibility. ALJ Benedict found Watson's allegations of pain not fully credible. Tr. at 18. She contends, however, that the evidence supports her allegations. The Commissioner argues that ALJ Benedict's credibility assessment is supported by the evidence of record. The court finds that ALJ Benedict's credibility assessment is not supported by substantial evidence.

There is a two-step process to determine whether a claimant is disabled by pain: (1) the ALJ must determine whether the claimant has a medical impairment "which could reasonably be expected to produce the pain or other symptoms alleged;" (2) if so, the ALJ must evaluate the intensity and persistence of the claimant's pain or symptoms and the extent to which it affects the claimant's ability to work. 20 C.F.R. §§ 416.929(c)(2). In evaluating the second prong, the ALJ cannot require objective evidence of the pain itself. *Craig*, 76 F.3d at 592–93. However, objective medical evidence is a useful indicator in making reasonable conclusions about the intensity and persistence of the claimant's pain. S.S.R. 96–97, 1996 WL 374186, at *6. Moreover, the ALJ *must* consider it in evaluating the individual's statements. *Id.* The following is a nonexhaustive list of relevant factors the ALJ should consider in evaluating a claimant's symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors;

(4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, received to relieve the symptoms; and (6) any measures the claimant has used to relieve the symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig*, 76 F.3d at 595 (holding that claimant's allegations of pain need not be accepted to extent that they are inconsistent with the record); *see also Hawley v. Colvin*, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013) (ALJ need not accept claimant's claims at face value). In addition to the objective medical evidence, the ALJ may consider the claimant's daily activities. 20 C.F.R. § 416.929(c)(3)(i); *see also Johnson*, 434 F.3d at 658 (holding that a claimant's daily activities, such as performing home exercises, taking care of family pets, cooking, and doing laundry, were inconsistent with claimant's complaints of excruciating pain and inability to perform basic physical and mental work activities). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

ALJ Benedict found Watson's allegations not fully credible. Tr. at 18. Although Watson alleged ongoing pain and numbness, ALJ Benedict noted that:

> [Watson] underwent ulnar decompression in the elbow and a right carpal tunnel release. However, a physical consultative examination indicated a Tinel's sign on the right, but that the claimant retained 5/5 strength bilaterally, and that she could grasp and manipulate. Her allegations of pain are given some weight. She has continued to complain of right hand and arm swelling and pain, with records in December 2011, and in March 2012, and June 2012 indicating that claimant was noted to have positive Tinel's sign on the right in April 2013. However, her physical examinations have indicated no more than minimal limitations.

*Id.*

Watson maintains that the evidence cited by ALJ Benedict does not contradict her allegations. She notes that the medical evidence shows she complained of pain, examinations consistently noted positive Tinel's sign as well as numbness, swelling, weakness, and decreased range of motion. *Id.* at 353, 355–56, 361, 372–773, 376–77, 393–96, 408–09, 413. Although ALJ Benedict found she could perform activities of daily living without limitation, he noted that Watson testified that she had difficulty combing her hair, cooking, and was unable to hold a broom or a mop. *Id.* at 16. She also testified that she cannot open jars, cut a sandwich, or carry a gallon of milk or a case of soda with her right hand. *Id.* at 46–47. Watson maintains that it is chronic neuropathic pain, not weakness or motor loss, that prevents her from full function with her upper extremities.

As with the medical opinion evidence, the Commissioner contends that Watson's allegations are belied by more recent evidence in the record. Specifically, the Commissioner argues that although Watson had swelling and pain, she had minimal functional limitations. The weakness she experienced after surgery was absent from subsequent records. *Id.* at 372–73, 376–77, 393–96, 408–14. Regardless of whether attributable to weakness or to pain, the Commissioner asserts that the records do not assess functional limitations.

Here, ALJ Benedict appears to cherry-pick evidence suggesting Watson's pain does is not as limiting as alleged. His step-three finding that she has no restrictions in performing activities of daily living is contradicted by both her hearing testimony as well as evidence within the record. Watson testified that she had difficulty combing her hair, cooking, and was unable to hold a broom or a mop. Tr. at 16. She also testified that she cannot open jars, cut a sandwich, or carry a gallon of milk or a case of soda with her right hand. Medical evidence reflects arm pain and swelling in January 2010, *id.* 362; bilateral arm pain, weakness and positive Tinel's signs in

February 2010, *id.* at 361; a March 2010 nerve conduction study showing median nerve sensory fiber involvement, *id.* at 357–59; swelling and pain causing Watson joint stiffness, cramps, and limitation with exam finding extreme edema in her fingers and wrist with decreased strength in July 2010, *id.* at 376–77; an MRI demonstrating moderate rotator cuff tendinopathy and tears in the labrum of her shoulder, *id.* at 380–83; neck pain as well as persistent and diffuse arm pain and swelling, positive Tinel's signs, and tenderness at the elbow in October 2010, *id.* at 353; in November 2010, Watson was advised to protect her elbow and minimize flexation and she had pain, tenderness, swelling, and decreased strength, *id.* at 372–73; Dr. Cohen opined that Watson's ability to lift, carry and handle objects would be moderately limited, *id.* at 386; Dr. Ernest Akpaka's noted that Watson must take frequent breaks when performing chores, *id.* at 391; in December 2011 Watson had swelling and decreased range of motion, *id.* at 395–96; a March 2012 exam showed decreased range of motion, swelling, and tenderness, *id.* at 393; in June 2012, Watson reported continued pain despite medication and exam noted edema in her hands, *id.* at 408–09; in July 2012, she reported pain again and Dr. Wunnava opined that she was suffering from chronic neuropathic pain from surgeries with elements of CRPS, D.E. 18-1 at 24–25; in November 2012, Watson again reported continued pain and an exam showed swelling and significantly reduced range of motion, *id.* at 33–35; and in April 2013, Watson had positive Tinel's and Phalen's signs, tr. at 413. Notably, UNC diagnosed Watson with upper extremity pain with possible complex regional pain syndrome or chronic neuropathic pain of the bilateral upper extremities despite the fact that her examination that showed that she had intact strength. D.E. 18-1 at 2–4. This suggests that a finding of full strength does not negate her pain allegations.

Additionally, Watson reported that she no longer drives. *Id.* at 391. Finally, records demonstrate she has trouble cooking and grooming, and an agency worker reported that Watson held her right hand stiffly to sign her name, could not bend her little finger, and her right hand and fingers were swollen. *Id.* at 255–57, 286.

While ALJ Benedict concluded that Watson had a medically-determinable impairments that could be expected to produce the symptoms she alleged, he erred evaluating in intensity and persistence of the her pain or symptoms and the extent to which it affects the her ability to work. Both the medical evidence and her reported activities of daily living establish consistent complaints of pain that have limited her ability to perform everyday functions. Examinations as well as imaging studies objectively corroborate Watson's allegations of pain. For ALJ Benedict to discredit her pain allegations because she had full strength and because physical examinations showed only minimal limitations is error, given that the record as a whole supports her allegations and given that pain is not objectively verifiable. *See Hyatt v. Sullivan*, 899 F.2d 329, 337 (4th Cir. 1990) ("Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree, *or functional effect* of pain is not determinative.") (emphasis added).

In light of Watson's reported limitations in her daily activities, the consistent and persistent nature of her complaints of pain, the surgeries, injections, and pain medication she has taken to alleviate her symptoms, and the lack of inconsistent evidence in the record discrediting her allegations of continuing pain, ALJ Benedict erred in evaluating her pain and her credibility. The credibility assessment cited minimal findings that fail to undermine her allegations or the other substantial evidence of record. Thus, remand for further consideration of this issue is appropriate.

## F.     Ability to concentrate and persist

Watson next contends that ALJ Benedict erred in formulating the RFC because he failed to account for her moderate difficulties in her maintaining concentration, persistence, and pace. The Commissioner argues that the medical evidence establishes that she can persist at simple tasks and, therefore, the RFC properly accounted for her limitation in this functional area. The court concludes that the RFC does not sufficiently address Watson's impairments in this functional area.

In *Mascio v. Colvin*, the Fourth Circuit joined the Third, Seventh, and Eighth Circuits by holding that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" 780 F.3d 632, 638 (4th Cir. 2015) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).  The Fourth Circuit noted that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.*  Because the ALJ in *Mascio* found at step three that the claimant had limitations in this functional area, but did not account for such limitations in the hypothetical questions at step five, the Fourth Circuit found that remand was appropriate. *Id.*

The Commissioner asserts that *Mascio* is distinguishable from the present case because examiner Eleanor E. Cruise, Ph.D., offered additional findings regarding Watson's moderate limitations in concentration, persistence, and pace. Dr. Cruise determined that Watson had moderate limitations in her ability to carry out detailed instructions and in her ability to maintain attention and concentration for extended periods. *Id.* at 120. Dr. Cruise further explained Watson's limitations in concentration and persistence by stating that she "may have some

difficulty maintaining concentration for extended periods but she can persist on simple tasks." *Id.* at 121. The Commissioner submits that this explanation sufficiently accounts for Watson's moderate limitations in the functional area of maintaining concentration, persistence and pace.

Watson asserts that the RFC and the hypothetical question fail to consider her moderate limitations in her ability to maintain concentration, persistence, and pace following the *Mascio* decision. As noted above, the RFC found that Watson could understand, remember, and carry out simple, routine, repetitive tasks. Tr. at 15. At step five, ALJ Benedict asked the VE to assume a hypothetical individual who was "limit[ed] to understanding, remembering, and carrying out simple, routine, repetitive tasks." *Id.* at 58. However, when questioning the VE about the availability of jobs, ALJ Benedict did not recite Dr. Cruise's explanation that Watson's moderate difficulties in maintaining concentration, persistence, and pace meant that she may have some difficulty maintaining concentration for extended periods but she can persist on simple tasks.

Several North Carolina federal district courts to address this issue addressed in *Mascio* have almost exclusively determined that remand was warranted because the limitation in concentration, persistence, and pace was not accounted for in the RFC and/or hypothetical question to the VE. *See Weeks v. Colvin*, No. 5:14-cv-155-D, at *4 (E.D.N.C. Sep. 8, 2015) (limitation to simple, routine, repetitive tasks with only occasional contact with the general public and few workplace changes did not sufficiently address claimant's limitations in pace); *Taylor v. Colvin*, No. 1:14-cv-629, 2015 WL 4726906 (M.D.N.C. Aug. 10, 2015) (RFC determination that claimant could understand, remember, and carry out one and two step instructions/tasks did not reflect address moderate limitations in concentration, persistence, and pace); *Scruggs v. Colvin*, No. 3:14–cv–00466–MOC, 2015 WL 2250890, at *5 (W.D.N.C. May 13, 2015) (finding that an ability to perform simple, routine, repetitive tasks in a nonproduction

environment, without more, does not account for claimant's moderate difficulties in concentration, persistence and pace); *Raynor v. Colvin*, No. 5:14–CV–271–BO, 2015 WL 1548996, at *2 (E.D.N.C. Apr. 7, 2015) (remanding where the hypothetical posed to the VE did not pose any limitations related to concentration and persistence other than limiting plaintiff to simple, routine tasks and the ALJ's written decision limited plaintiff to work with simple instructions and work-related decisions as well as no fast-paced production); *Salmon v Colvin*, No. 1:12-cv-1209, 2015 WL 1526020, at *3 (M.D.N.C. Apr. 2, 2015) (holding that a hypothetical limiting claimant to "simple, routine, repetitive tasks in that [she] could apply commonsense understanding to carry out instructions furnished on a written, oral, or diagrammatic form" did not account for claimant's moderate limitations in concentration, persistence and pace and did not address her ability to say on task).

In the present case, as noted above, the RFC and the hypothetical question to the VE contemplated an individual "limit[ed] to understanding, remembering, and carrying out simple, routine, repetitive tasks." Tr. at 58. Neither the RFC nor the hypothetical question to the VE offered further explanation of this limitation. Additionally, ALJ Benedict did not conclude that Watson's moderate limitation in concentration, persistence, and pace had no impact on her ability to perform work activity. The majority of courts in North Carolina, including this court, have held that such restrictions do not adequately address a claimant's moderate limitations in concentration, persistence and pace. *See Taylor*, 2015 WL 4726906, at *7. Given the case law, further consideration of Watson's moderate limitations in concentration, persistence, and pace as they impact other work is warranted.

Although the ALJ's findings at step three may not require any additional limitations for concentration, persistence, or pace in the RFC, the ALJ must at least provide a sufficient

explanation in the decision to allow the court to conduct meaningful review of the RFC determination. *See Scruggs*, 2015 WL 2250890, at *5; *Reinhardt v. Colvin*, No. 3:14–cv–00488–MOC, 2015 WL 1756480, at *3 (W.D.N.C. Apr. 17, 2015). However, ALJ Benedict's decision does not explain how he accounted for the moderate limitations in concentration, persistence, and pace when formulating Watson's RFC or at step five. His decision did not reference Dr. Cruise's evaluation or assign it a specific weight. His step-three discussion determining whether Watson's impairments meet a Listing fails to sufficiently address the limitations in concentration, persistence and pace as they relate to the RFC as required by *Mascio*. On remand, the ALJ should specifically state how the RFC determination reflected Watson's limitations in concentration, persistence, and pace[2] and whether the ALJ has determined that the moderate limitations in concentration, persistence, and pace had no impact on her ability to work. Accordingly, remand for further consideration of Watson's limitations in maintaining concentration, persistence, and pace is appropriate

### G.     Other agency determination

Watson next argues that ALJ Benedict failed to consider the determination by North Carolina Vocational Rehabilitation Services ("VRS"). On March 29, 2012, VRS issued a letter concluding that Watson had significant deficits in interpersonal skills, communication, self-direction, and work tolerance. Tr. at 313. VRS concluded that Watson was unable to work at that time. *Id.* The Commissioner contends that the VRS letter is not a finding of disability and thus it is not due deference by ALJ Benedict.

As provided at 20 C.F.R. § 404.1504 and further explained in Social Security Ruling ("S.S.R.") 06–03p, "a determination made by another agency that [the claimant is] disabled or

---

[2] Given the case law cited above, it would be seem that the RFC limitation, as stated, could not account for moderate limitations in concentration, persistence, and pace.

blind is not binding on" the Social Security Administration. 20 C.F.R. § 404.1504. Rather, "the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner." S.S.R. 06–03p.

However, the Fourth Circuit addressed the value of disability findings by other agencies in *Bird v. Commissioner of Social Security Administration*, 699 F.3d 337 (4th Cir. 2012). The Fourth Circuit noted that while another agency's disability determination is not binding on the SSA, "another agency's disability determination 'cannot be ignored and must be considered.'" *Bird*, 699 F.3d at 343. In considering the weight to give a decision of the Veterans Administration ("VA") in particular, the Fourth Circuit held:

> The assignment of at least some weight to a VA disability determination reflects the fact that both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims.

*Bird*, 699 F.3d at 343 (internal quotations omitted). The Fourth Circuit therefore concluded that "in making a disability determination, the SSA must give substantial weight to a VA disability rating," and "an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate." *Id.*

VRS issued a letter dated March 29, 2012, which noted that Watson "has significant deficits in . . . interpersonal skills, communication, self-direction[,] and work tolerance[]" and concluded that "she is unable to work in her present condition[.]" Tr. at 313. The issue, therefore, is whether the VRS finding constitutes a disability determination that warrants consideration under *Bird*.

Here, ALJ Benedict did not explain the weight given to the VRS letter. Because the undersigned is recommending reversal and remand on other issues, it is not necessary to address this issue in a detail. Even if the letter does not qualify as a disability determination, an ALJ must still explain the weight given to the opinions of non-medical sources and the reasons for the weight given. *See* S.S.R. 06–03p. Additionally, another North Carolina district court concluded that "under different circumstances, the failure of the ALJ to specifically refer to the Vocational Rehabilitation assessments would warrant remand to the Commissioner for reconsideration in order to permit the ALJ to consider the Vocational Rehabilitation Service's statement and state what weight, if any, the decision played in the ALJ's analysis." *Bannister v. Colvin*, No. 1:14-cv-741, 2015 WL 5027530, at *6 (M.D.N.C. Aug. 25, 2015) (citing *Bird*, 699 F.3d at 343) (noting that although another agency's disability determination is not binding on the SSA, such a determination cannot be ignored and must be considered); *Wilson v. Colvin*, No. 1:11-CV-256, 2014 WL 4274253, at *5–6 (M.D.N.C. Aug. 29, 2014), *adopted*, slip op. (M.D.N.C. Sept. 17, 2014); *Suggs v. Astrue*, No. 4:11–CV–128–FL, 2013 WL 466406, at *4 (E.D.N.C. Feb. 7, 2013) (not harmless error where ALJ failed to consider VA disability determination because it may have a bearing on the Social Security determination); *Watson v. Astrue*, No. 5:08–CV–553–FL, 2009 WL 2423967, at *3 (E.D.N.C. Aug. 6, 2009) (noting that remand is proper where an ALJ fails to explain weight given to a state Medicaid decision)).

Because remand is recommended on other issues, the undersigned concludes that, upon remand, the ALJ should also consider and weigh the VRS letter in making a determination on Watson's disability claim. Consequently, Watson is entitled to relief on this claim.

## H.    Additional evidence

Watson also argues that she submitted additional evidence prior to ALJ Benedict's decision that was not made part of the administrative record.  The evidence consists of medical records from UNC from 2010 through 2012 and includes orthopedic and pain management treatment records. Because she cannot be sure that it was considered, she contends remand is also warranted on this issue. The Commissioner asserts that the evidence Watson references covers the same time period as evidence already in the record and, further, that the additional evidence would not change the outcome of the case.  Watson submits, however, that the UNC records are the only evidence of her diagnosis of chronic neuropathic pain.

Given that remand is appropriate on other grounds, the court need not decide whether the additional evidence is material but concludes that, upon remand, such evidence be incorporated into the record and appropriately considered. Accordingly, Watson's motion should be granted on this issue.

## III.    Conclusion

For the forgoing reasons, the court recommends that Watson's Motion for Judgment on the Pleadings (D.E. 17) should be granted, that Colvin's Motion for Judgment on the Pleadings (D.E. 27) should be denied, and that the Commissioner's final decision should be remanded for further consideration.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel.  Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation.  The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the

Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Owen v. Collins*, 766 F.2d 841, 846–47 (4th Cir. 1985).

Dated: January 4, 2016.

_____
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE